UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

CLARENCE THIBODEAUX

CIVIL ACTION NO. 6:16-cv-00444

VERSUS

JUDGE HICKS

U.S. COMMISSIONER, SOCIAL
SECURITY ADMINISTRATION

MAGISTRATE JUDGE HANNA

## REPORT  AND  RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision be reversed and remanded for further administrative action.

### ADMINISTRATIVE PROCEEDINGS

The claimant, Clarence Thibodeaux, fully exhausted his administrative remedies before filing this action in federal court. The claimant filed an application for disability insurance benefits ("DIB") and an application for Supplemental Security Income ("SSI"), alleging disability beginning on November 1, 2012.[1] His applications were denied.[2] The claimant requested a hearing,[3] which was held on

---

[1]    Rec. Doc. 7-1 at 127, 131.

[2]    Rec. Doc. 7-1 at 73, 74.

[3]    Rec. Doc. 7-1 at 82.

June 10, 2014 before Administrative Law Judge Kathleen S. Molinar.[4]  The ALJ

issued a decision on October 21, 2014,[5] concluding that the claimant was not disabled

within the meaning of the Social Security Act from November 1, 2012 through the

date of the decision.  The claimant asked for review of the decision, but the Appeals

Council concluded that there was no basis for review.[6]  Therefore, the ALJ's decision

became the final decision of the Commissioner for the purpose of the Court's review

pursuant to 42 U.S.C. § 405(g).  The claimant then filed this action seeking review

of the Commissioner's decision.

## SUMMARY OF PERTINENT FACTS

The claimant was born on July 29, 1956.[7]  At the time of the ALJ's decision,

he was fifty-seven years old.  He has a seventh grade education[8] and relevant work

experience as a fish cleaner for a seafood processor.[9]  He alleged that he has been

---

[4]     Rec. Doc. 7-1 at 30-50.

[5]     Rec. Doc. 7-1 at 15-24.

[6]     Rec. Doc. 7-1 at 4.

[7]     Rec. Doc. 7-1 at 51, 27, 131.

[8]     Rec. Doc. 7-1 at 32.

[9]     Rec. Doc. 7-1 at 34.

disabled since November 1, 2012[10] due to hypertension, diabetes, nerves, mental retardation, and a back condition.[11]

On June 4, 2012,[12] the claimant was seen by a doctor at the emergency department of University Medical Center ("UMC") in Lafayette, Louisiana. He complained that his face color was getting darker and that he had been having headaches for three weeks. He denied having hypertension in the past. His blood pressure was 163/92. He rated his pain at five on a scale of one to ten. The treatment notes indicate that he had experienced similar symptoms in the past. He was diagnosed with hypertension and given a prescription for medication to treat that condition.

A medical history document from the St. Martin Parish jail, dated August 13, 2012,[13] indicates that the claimant was not feeling suicidal at that time but had attempted suicide four years earlier, and had a history of hypertension, diabetes, drug addiction, alcoholism, and mental illness. He was then taking medication for hypertension.

---

[10]    Rec. Doc. 7-1 at 51, 178.

[11]    Rec. Doc. 7-1 at 51, 178.

[12]    Rec. Doc. 7-1 at 237-244.

[13]    Rec. Doc. 7-1 at 323.

Another document from the jail, dated August 14, 2012,[14] indicates that the claimant had a history of diabetes and hypertension, was on a low salt diet, took no medication for his diabetes (having stopped taking insulin two years earlier), and took an unidentified pink pill for hypertension.  His mental health status was described as stable.

On November 24, 2012, the claimant was again seen in UMC's emergency department,[15] having been sent over from the St. Martin Parish jail due to a high blood sugar reading.  He also complained of headaches and weakness.  His blood glucose level was 474, and his blood pressure was 151/102.  He rated his pain at five on a ten point scale.  His symptoms included headache, increased thirst, increased voiding, blurred vision, and dizziness.  He had a tooth infection, for which he was taking antibiotics.  He had been diagnosed with diabetes in the past but was not taking any medication for that condition.  He was given Zofran for nausea and insulin by IV.  He was diagnosed with non-insulin-dependent diabetes mellitus, headache, and hypertension.  He was prescribed Metformin for the diabetes.

---

[14]    Rec. Doc. 7-1 at 324.

[15]    Rec. Doc. 7-1 at 245-259.

-4-

On January 9, 2013, when the claimant applied for Social Security benefits, it was noted that he had a messy appearance, he spoke very loudly and rapidly, he fell asleep during the interview, and he insisted on taking off his shoes.[16]

On February 4, 2013,[17] the claimant was again seen in UMC's emergency room.  He had been taken to the hospital by ambulance due to an altercation that resulted in a loss of consciousness and a laceration to his head.  He rated his pain as nine out of ten.  The scalp laceration was repaired with staples.  A CT scan of the brain was ordered due to the trauma to the back of the claimant's head, and it showed no acute intracranial abnormalities but mild global atrophy of the brain.  A CT scan of the cervical spine was also obtained, which showed a loss of normal cervical lordosis that could be due to muscle spasm or the positioning of the patient as well as moderate degenerative changes at the C5-C7 levels and osseous compromise of the left lateral recess at C6-7.

The claimant returned to the UMC emergency department on February 22, 2013.[18]  He had called an ambulance because his blood sugar number was very low. He was given medication by the EMS crew, and his symptoms resolved before he

---

[16]     Rec. Doc. 7-1 at 175.

[17]     Rec. Doc. 7-1 at 260-271.

[18]     Rec. Doc. 7-1 at 275-281.

arrived at the hospital.  It was noted that the claimant is a poor historian.  For example, he did not know what doctor had prescribed his diabetes medication.

On March 1, 2013, a pain questionnaire was filled out at the request of Disability Determination Services.[19]  The responses to the questions listed on the form indicate that the claimant's diabetes began on August 5, 2012, that he passes out approximately twice per month due to being in a diabetic coma, that medication was prescribed for him by a physician at UMC, that he takes insulin and other medication daily, that his medication causes his eyes to get blurry, that he needs assistance to do errands because he cannot drive due to never knowing when he might lose consciousness, that he can only stand for about ten minutes at a time, and that he does no cooking or housekeeping chores.

On April 29, 2013, the claimant was examined by M. Lucy Freeman, M.D., a clinical psychologist.[20]  The claimant told her that he repeated first grade several times, quit school in the seventh grade at the age of sixteen or seventeen, and cannot read.  He stated that he had worked at Trappey's (a local food processing company), for the railroad, for a landscaping firm, on a trash truck, and at Guidry's Catfish.  He reported that he stopped working because he kept collapsing.  He stated that he was

---

[19]        Rec. Doc. 7-1 at 186-188.

[20]        Rec. Doc. 7-1 at 282-286.

diagnosed with diabetes in December 2012 after going into a diabetic coma.  He also indicated that he has high blood pressure and back pain resulting from an injury sustained when he worked on the railroad.  He stated that he does not wear prescription glasses but needs them and has a little trouble with his hearing.  The claimant reported that he had a nervous breakdown after his mother died and was hospitalized at a mental health facility for thirty days for depression and suicidal ideation.  He had an upcoming appointment at a mental health facility.[21]  The claimant's medications were Metformin (for diabetes), Lisinopril (for hypertension), and Glipizide (for diabetes).  He stated that he formerly took "nerve medication" but could no longer afford it.  He stated that he formerly was a heavy drinker and used recreational drugs as a teenager but no longer uses drugs and drinks only occasionally.

In addition to interviewing the claimant, Dr. Freeman observed his behavior and examined his mental status.  He was cooperative and responded appropriately. He understood and followed simple instructions.  He exhibited fair insight and judgment and was fully oriented to time, place, and situation.  He told Dr. Freeman that he does not help his wife with cooking or cleaning, sometimes needs help getting

---

[21]    This Court notes that the record contains no treatment notes from any mental health care provider.

out of the bathtub because of a bad back and bad knee, and does not drive because his license was revoked in 2012 following four DWI arrests.

Dr. Freeman administered an intelligence test, which showed that the claimant performed in the extremely low range in comparison to same-aged peers.  In her opinion, the test was valid.  The claimant's score on the WAIS-IV Full Scale Intelligence test was 61.

Dr. Freeman diagnosed the claimant with depressive disorder not otherwise specified, alcohol abuse, and mild mental retardation.  She assigned a global assessment of functioning ("GAF") score of 55.[22]  She further opined that the claimant would likely be unable to manage funds without supervision, would likely be able to get along with coworkers and supervisors, but would likely be unable to tolerate the stress or pressure in an employment situation.

---

[22]    The GAF scale is used to rate an individual's "overall psychological functioning." American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV") 32 (4th ed. 1994).  The scale ascribes a numeric range from "1" ("persistent danger of severely hurting self or others") to "100" ("superior functioning") as a way of categorizing a patient's emotional status.  A GAF score in the 51 to 60 range indicates "moderate symptoms" such as flat affect, circumstantial speech, occasional panic attacks or moderate difficulty in social, occupational, or school functioning such as few friends or conflicts with peers or coworkers.  The GAF scale was omitted from DSM–5 because of its "conceptual lack of clarity. . . and questionable psychometrics in routine practice."  American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders ("DSM–5") 16 (5th ed. 2013).

On June 24, 2013, the claimant returned to the emergency department at UMC.[23]  His primary complaint was that he needed to refill his diabetes medicine, having taken the last dose the day before.  He was prescribed Glipizide, Lisinopril, and Metformin.

The claimant was seen in the emergency department at St. Martin Hospital in Breaux Bridge, Louisiana on July 10, 2013,[24] having arrived by ambulance.  He was diagnosed with hypoglycemia, and the same three medications were ordered.

The claimant returned to the UMC emergency room on November 5, 2013.[25] He stated that his blood sugar was going up and down and he needed refills on his medications.  He was diagnosed with chronic hypertension and diabetes and was referred to the medicine clinic.

The claimant missed appointments at UMC's internal medicine clinic in January and February 2014[26] but was seen at the clinic on March 24, 2014.[27]  He stated that he falls frequently, has diarrhea, and has occasional dizziness and

---

[23]    Rec. Doc. 7-1 at 304-312.

[24]    Rec. Doc. 7-1 at 313-322.

[25]    Rec. Doc. 7-1 at 296-303.

[26]    Rec. Doc. 7-1 at 294, 295.  At the hearing, the claimant explained that he missed appointments due to not having transportation.  Rec. Doc. 7-1 at 37.

[27]    Rec. Doc. 7-1 at 291-293.

sweating.  He reported that he stopped taking Metformin because it upset his stomach.  He tested positive for Hepatitis C.

On June 10, 2014, the claimant testified at a hearing regarding his symptoms and his medical treatment.  He complained primarily about the symptoms related to his diabetes, including passing out due to diabetic coma, becoming confused, experiencing dizziness and sweating, and having to sit down and rest for thirty to forty-five minutes when his blood sugar level drops.[28]  He explained that he does not understand what the numbers mean when he tests his blood sugar.[29]  Therefore, he goes to the St. Martin Hospital once or twice a week to have his blood sugar level tested.[30]  At the time of the hearing, he was still prescribed Metformin, Glipizide, and Lisinopril.[31]

## ANALYSIS

### A.    STANDARD OF REVIEW

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the

---

[28]    Rec. Doc. 7-1 at 35-36, 38, 41-42.

[29]    Rec. Doc. 7-1 at 44-45.

[30]    Rec. Doc. 7-1 at 44.

[31]    Rec. Doc. 7-1 at 225.

proper legal standards were used in evaluating the evidence.[32] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[33] Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[34]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[35] In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[36] Conflicts in the evidence[37] and credibility assessments[38] are for the Commissioner to resolve, not the courts. Four elements of proof are weighed by the courts in determining if substantial

---

[32]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[33]    *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[34]    *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[35]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[36]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[37]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[38]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education, and work experience.[39]

**B.    ENTITLEMENT TO BENEFITS**

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[40]  Every individual who meets certain income and resource requirements, has filed an application for benefits, and is determined to be disabled is eligible to receive Supplemental Security Income ("SSI") benefits.[41]

A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[42]  A claimant is disabled only

---

[39]    *Wren v. Sullivan*, 925 F.2d at 126.

[40]    See 42 U.S.C. § 423(a).

[41]    42 U.S.C. § 1382(a)(1) & (2).

[42]    42 U.S.C. § 1382c(a)(3)(A).

if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[43]

## C.  EVALUATION PROCESS AND BURDEN OF PROOF

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled.  This process requires the ALJ to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[44] "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."[45]

---

[43]      42 U.S.C. § 1382c(a)(3)(B).

[44]      20 C.F.R. § 404.1520.

[45]      *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[46] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[47]   The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[48]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[49]   This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[50]   If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to

---

[46]     20 C.F.R. § 404.1520(a)(4).

[47]     20 C.F.R. § 404.1545(a)(1).

[48]     20 C.F.R. § 404.1520(e).

[49]     *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[50]     *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

rebut this finding.[51]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[52]

## D.  THE ALJ'S FINDINGS AND CONCLUSIONS

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since November 1, 2012.[53]  This finding is supported by substantial evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments:  an organic mental disorder, an affective disorder, diabetes, and hypertension.[54]  This finding is supported by substantial evidence in the record.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[55]  The claimant challenges this finding, arguing that his intellectual impairment satisfies the criteria of Listing 12.05(C).

---

[51]     *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[52]     *Greenspan v. Shalala*, 38 F.3d at 236.

[53]     Rec. Doc. 7-1 at 17.

[54]     Rec. Doc. 7-1 at 18.

[55]     Rec. Doc. 7-1 at 18.

The ALJ found that the claimant has the residual functional capacity to perform medium work except that he is limited to performing simple, unskilled work and work requiring no climbing or exposure to hazards and heights due to dizziness related to diabetes and hypertension.[56]

At step four, the ALJ found that the claimant is capable of performing his past relevant work as a fish cleaner.[57]  The claimant challenges this finding.

Having found the claimant not disabled at step four, the ALJ did not proceed to step five.

## E.    THE ALLEGATIONS OF ERROR

The claimant contends that the ALJ erred in failing to consider whether his intellectual impairment meets or equals the requirements of Listing 12.05.

## F.    THE ALJ'S FAILURE TO CONSIDER LISTING 12.05 CONSTITUTES REVERSIBLE ERROR

In applying for Social Security disability benefits and SSI, the claimant listed mental retardation as one of his impairments, and the state agency medical consultants who initially ruled on his applications noted that he claimed to be mentally retarded and further noted that examining psychologist Dr. Lucy Freeman

---

[56]    Rec. Doc. 7-1 at 20.

[57]    Rec. Doc. 7-1 at 23.

diagnosed him as being mentally retarded.[58]  But none of the consultants, including Darrell Snyder, Ph.D., who performed a psychiatric review technique assessment, evaluated whether the claimant met the criteria for Listing 12.05, the listing for intellectual disability (formerly referred to as mental retardation[59]).  Similarly, even after noting in her ruling that Dr. Freeman found the claimant to be mentally retarded,[60] the ALJ did not evaluate whether the claimant met the criteria of Listing 12.05.

In January 2013, when the claimant filed his applications for benefits, Listing 12.05 consisted of an introductory paragraph or "capsule definition," setting forth the diagnostic criteria, followed by four "severity prongs" (paragraphs A through D).[61] In order to satisfy Listing 12.05, a claimant was required to meet both the capsule definition and one of the four severity prongs.[62]  The version of Listing 12.05 in effect at the time the claimant filed his applications for benefits read as follows:

---

[58]     Rec. Doc. 7-1 at 51, 52, 53, 54, 55, 56, 62, 63, 64, 65, 67, 178.

[59]     Change in Terminology:  "Mental Retardation" to "Intellectual Disability," 78 Fed. Reg. 46499-01, 2013 WL 3936340, Aug. 1, 2013.  See, also, *Calderwood v. Colvin*, No. 4:14-CV-00495-CAN, 2016 WL 1077956, at *9 (E.D. Tex. Mar. 18, 2016).

[60]     Rec. Doc. 7-1 at 19.

[61]     *Bennett v. Colvin*, No. 1:15-CV-233-JCG, 2017 WL 706046, at *3 (S.D. Miss. Feb. 22, 2017).

[62]     *Randall v. Astrue*, 570 F.3d 651, 659 (5th Cir. 2009).

12.05 Mental Retardation:  Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period: i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied

* * *

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;. . . . [63]

Testing performed by Dr. Freeman established that the claimant has a full scale IQ score below 70, and the ALJ found that the claimant has four severe impairments, i.e., an organic mental disorder, an affective disorder, diabetes, and hypertension. The ALJ did not evaluate whether the combination of these factors – a low IQ and additional impairments – satisfies Listing 12.05(C).

The claimant argued that the ALJ's failure to address Listing 12.05(C) is reversible error.  The Commissioner argued, however, that the ALJ did not err in failing to determine whether Listing 12.05(C) was met because "[a]lthough the ALJ did not specifically mention Listing 12.05(C), the ALJ clearly found that [the claimant] did not meet Listing 12.05(C) because Plaintiff's 'adaptive functioning was

---

[63]    *Bennett v. Colvin*, 2017 WL 706046, at *3 (citing 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05 (effective June 13, 2012, to April 4, 2013)).

at such a level that he was able to live independently, as well as engage in substantial gainful activity for many years.'"[64]

The record contains no medical documentation predating the claimant's alleged disability onset date. Therefore, it is unclear whether the claimant had the four severe impairments before his alleged disability onset date of November 1, 2012. The record indicates that the claimant denied having hypertension before June 2012, when he was diagnosed with that disease. The claimant told Dr. Freeman that he was diagnosed with a severe impairment – diabetes – in December 2012 after going into a diabetic coma. If the hypertension and diabetes were indeed new impairments or if they were pre-existing impairments that only began to have a significant negative affect on the claimant's functionality in 2012, then the claimant's prior ability to live independently and engage in substantial gainful activity prior to that point is irrelevant to the issue of whether he met Listing 12.05(C) on or after his alleged disability onset date of November 1, 2012.

The ALJ found that the claimant has severe mental impairments consisting of an organic mental disorder and an affective disorder. The ALJ noted in her ruling

---

[64]        Rec. Doc. 9 at 3, quoting Rec. Doc. 7-1 at 23.

that a CT scan of the brain obtained in February 2013[65] was unremarkable.  While that scan was unremarkable with regard to certain listed aspects of the claimant's brain, it showed that the claimant had "mild global atrophy."[66]  Whether this is evidence of the organic mental disorder found by the ALJ to exist is unclear.  The effect of this condition on the claimant's functioning is also unclear from the record.

The record contains evidence that the claimant was treating at the Dr. Joseph H. Tyler Mental Health Center in the spring of 2013.  But the record contains no treatment notes or other documents from that facility and no indication that records from that facility were requested in connection with the claimant's applications for benefits.  The Fifth Circuit imposes a duty on the ALJ to fully and fairly develop the facts relative to a claim for benefits.[67]  The Supreme Court has described Social Security administrative proceedings are "inquisitorial rather than adversarial."[68]  Accordingly, "[i]t is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits. . . ."[69]  When the ALJ fails in his duty to

---

[65]    The ruling states erroneously that the CT scan was obtained in February 2014; it was actually obtained on February 4, 2013.  Rec. Doc. 7-1 at 270.

[66]    Rec. Doc. 7-1 at 270.

[67]    *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000); *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995); *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984).

[68]    *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000).

[69]    *Sims v. Apfel*, 530 U.S. at 111.

-20-

develop the record, he does not have before him sufficient facts on which to make an

informed decision, and his decision is not supported by substantial evidence.[70]

However, reversal is appropriate only if the claimant shows that he was prejudiced

as a result of the insufficient record.[71]  "A mere allegation that additional beneficial

evidence might have been gathered had the error not occurred is insufficient to meet

this burden."[72]  "To establish prejudice, a claimant must show that he 'could and

would have adduced evidence that might have altered the result.' "[73]  Stated another

way, a claimant demonstrates prejudice when he shows "that additional evidence

would have been produced if the ALJ had fully developed the record, and that the

additional evidence might have led to a different decision.'"[74]  In this case, it is

impossible to know whether the claimant's mental health treatment records would

contain evidence supporting the ALJ's ruling, but in any event, the ALJ should have

obtained records from the claimant's mental health services providers in order to fully

develop the record for the purpose of determining whether the claimant's mental

---

[70]     *Kane v. Heckler*, 731 F.2d at 1219; *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996).

[71]     *Kane v. Heckler*, 731 F.2d at 1220; *Bowling v. Shalala*, 36 F.3d at 437; *Brock v. Chater*, 84 F.3d at 728.

[72]     *Jones v. Astrue*, 691 F.3d 730, 735 (5th Cir. 2012).

[73]     *Brock v. Chater*, 84 F.3d at 728 (quoting *Kane v. Heckler*, 731 F.2d at 1220).

[74]     *Newton v. Apfel*, 209 F.3d at 458 (quoting *Ripley v. Chater*, 67 F.3d at 557 n. 22).

health impacts his functionality to the point that, when combined with his low IQ, he meets the criteria of Listing 12.05.

The ALJ has a duty to analyze the claimant's impairments under every applicable listing, and a failure to do so is harmless only if the record shows that the listing's requirements are not met.[75]  Other courts in this circuit have held, more specifically, that an ALJ must consider Listing 12.05(C) when the record includes evidence of low IQ and other severe impairments.[76]  Here, there is no dispute that the claimant has both a low IQ and other severe impairments.  Furthermore, it was established at the hearing that the work being done by the claimant at that time was in a sheltered environment where he was permitted to take breaks as needed because his employer was "making some accommodations for him, apparently because they've known him for so long."[77]

Because the record contains strong evidence of intellectual disability, the ALJ's decision must be reversed so that the Commissioner can evaluate whether the claimant meets the requirements of Listing 12.05.

---

[75]      See *Audler v. Astrue*, 501 F.3d 446, 448–49 (5th Cir. 2007).

[76]      See, e.g., *Thompson v. Colvin*, No. 3:13–CV–2616–O, 2013 WL 5450282, *3 (N.D. Tex. Sept. 30, 2013); *Simmons v. Astrue*, No. 3–10–CV–1516–B–BK, 2011 WL 1196938 at *5 (N.D.Tex. Mar.11, 2011), recommendation adopted, 2011 WL 1211053 (N.D. Tex. Mar. 30, 2011); *Bailey v. Astrue*, No. 3-10-CV-1187-BD, 2011 WL 4048394, at *4 (N.D. Tex. Sept. 12, 2011).

[77]      Rec. Doc. 7-1 at 49.

-22-

## CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court recommends that the Commissioner's decision be REVERSED and REMANDED to the Commissioner, pursuant to the fourth sentence of 42 U.S.C. § 405(g), for further administrative proceedings with instructions to determine whether the claimant's intellectual impairment meets or equals the criteria of Listing 12.05. The Commissioner should develop the record by obtaining treatment notes and other relevant documentation from the mental health care professionals who provided services to the claimant. The claimant should be afforded an opportunity to supplement the record with updated medical records and to testify at another hearing. Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).[78]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after

---

[78]    See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[79]

Signed in Lafayette, Louisiana, this 16th day of May 2017.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[79]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).